18-55336

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WAVERLY SCOTT KAFFAGA,
as Executor of the Estate of
Elaine Anderson Steinbeck,
*Plaintiff-Appellee*,

v.

THE ESTATE OF THOMAS STEINBECK,
GAIL KNIGHT STEINBECK, and
THE PALLADIN GROUP, INC.,
*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of California, Case No. 2:14-cv-08699,
Senior District Judge Terry J. Hatter, Jr.

# CORRECTED OPENING BRIEF OF APPELLANTS THE ESTATE OF THOMAS STEINBECK, GAIL KNIGHT STEINBECK, AND THE PALLADIN GROUP, INC.

Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com

*Counsel for Appellants*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTERESTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1, Defendants-Appellants make the following disclosures:

1) No party is a subsidiary or affiliate of a publicly-owned corporation.

2) There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ................................................................ 3

CONCISE STATEMENT OF THE CASE AND FACTUAL
    BACKGROUND .................................................................................. 4

I.    Procedural Background .................................................................... 4

II.   Factual Background ......................................................................... 6

    A.    The Steinbeck Works, the Parties, and the Statutory
        Background ............................................................................. 6

    B.    The 1983 Agreement .............................................................. 8

    C.    Developments Between 1983 and 2004 ................................ 10

    D.    *The Grapes of Wrath* Film Rights........................................ 11

    E.    *East of Eden* Film Rights ...................................................... 12

    F.    The 2004 Steinbeck Litigation ............................................. 13

    G.    Disputes Arose Again in 2014 About the Ownership of
        Certain Steinbeck Works........................................................ 14

        1.    Thom Steinbeck Sued the Estate to Seek Clarity on
            Certain Rights (the "Parallel Litigation") ..................... 14

        2.    The Estate Responded by Suing Gail and Thom,
            and the Estate was Awarded Over $13 Million ............ 18

SUMMARY OF THE ARGUMENT ......................................................... 21

ARGUMENT ............................................................................................ 23

III.   Standards Of Review ................................................... 23

IV.   The District Court Erroneously Excluded Evidence And
      Argument About Whether The 1983 Agreement Is An
      "Agreement To The Contrary" And About Gail Steinbeck's
      Genuine Belief Of Having Termination Rights ........................... 24

      A.   The 1983 Agreement is an Agreement to the Contrary ....... 25

           1.   No court has ever held that the 1983 Agreement is
                not an "agreement to the contrary" ............................. 25

           2.   If the Court takes up the issue, the 1983
                Agreement should be deemed an "agreement to the
                contrary" ...................................................... 31

           3.   Because the 1983 Agreement is an Agreement to
                the Contrary, Gail and Thom Had Rights to and
                Control Over Certain Works .......................... 39

           4.   Gail and Thom Had Valid Defenses to the Estate's
                Claims ............................................. 43

      B.   The District Court Erroneously Excluded Evidence
           About Gail's Understanding of the 2004 Litigation and
           Copyright Control Under the 1983 Agreement ................... 44

           1.   Intentional Interference Claim ....................... 45

           2.   Excluded Evidence Relating to Intentional
                Interference ...................................... 48

V.    The Award of Punitive Damages Should Be Vacated ................... 56

      A.   Legal Standard for Punitive Damages ................................ 56

      B.   The Excluded Evidence of Gail and Thom's Genuine
           Belief About Termination Rights was Relevant to
           Punitive Damages .................................. 58

      C.   The Admitted Evidence Did Not Establish the
           Necessary Intent With Clear and Convincing Evidence ...... 59

D. The Punitive Damages Award Is Improper As A Matter Of Law Because It Is Disproportionate To The Evidence Of Defendants' Financial Condition ..................... 60

VI. There Was No Substantial Evidence Supporting The Damages For The Breach Of The 1983 Agreement ...................... 63

A. Double Recovery for Breach and Tort Damages Is Not Permitted ................................................................. 64

B. Evidence of Damages for the Breach was Speculative ........ 66

VII. There Was No Substantial Evidence Supporting The Damages For Slander of Title ........................................... 68

VIII. Statement Regarding Oral Argument ........................................... 72

IX. Conclusion ...................................................................... 72

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Adams v. Murakami,*
813 P.2d 1348 (Cal. 1991) ........................................................ 60, 61, 63

*Ashland Management Inc. v. Janien,*
624 N.E.2d 1007 (N.Y. 1993) ............................................................. 66

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996) ................................................................... 56, 60

*Classic Media, Inc. v. Mewborn,*
532 F.3d 978 (9th Cir. 2008) .......................................................... 32, 34

*City of Pomona v. SQM North America Corp.,*
750 F.3d 1036 (9th Cir. 2014) ............................................................ 23

*Cooper Industries Inc. v. Leatherman Tool Group, Inc.,*
532 U.S. 424 (2001) ...................................................................... 57

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
902 P.2d 740 (1995) ...................................................................... 45

*Egan v. Mutual Omaha Insurance Co.,*
598 P.2d 452 (1979) .................................................................. 57, 60

*Ford v. City of Yakima,*
706 F.3d 1188 (9th Cir. 2013) ............................................................ 23

*Fred Fisher Music Co., Inc. v. M. Witmark & Sons,*
318 U.S. 643 (1943) ...................................................................... 33

*Haddad v. Lockheed California Corp.,*
720 F.2d 1454 (9th Cir. 1983) ............................................................ 24

*Johnson v. Ford Motor Co.,*
113 P.3d 82 (Cal. 2005) .................................................................. 60

*Kenford Co. v County of Erie,*
  493 N.E. 2d 234 (N.Y. 1986) ........................................................ 67, 68

*Kenford Co. v County of Erie,*
  537 N.E.2d 176 (N.Y. 1989) ........................................................ 67, 68

*Khoury v. Maly's of California, Inc.,*
  17 Cal. Rptr. 2d 708 (Cal. Ct. App. 1993) .................................... 64, 65

*Korea Supply Co. v. Lockheed Martin Corp.,*
  63 P.3d 937 (Cal. 2003) ................................................................ 45, 47

*Larson v. Warner Brothers Entertainment, Inc.,*
  640 Fed. App'x 630 (9th Cir. 2016) ..................................................... 36

*Lowell v. Mother's Cake & Cookie Co.,*
  144 Cal. Rptr. 664 (Cal. Ct. App. 1978) ............................................. 47

*Marble Bridge Funding Group, Inc. v.*
  *Euler Hermes American Credit Indemnity Co.,*
  225 F. Supp. 3d 1034 (N.D. Cal. 2016) .............................................. 58

*Martin v. California Deparment of Veterans Affairs,*
  560 F.3d 1042 (9th Cir. 2009) ............................................................ 24

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280 (2d Cir. 2002) ................................................... 33, 38, 39

*Mills Music, Inc. v. Snyder,*
  469 U.S. 153 (1985) ............................................................................ 34

*Milne v. Stephen Slesinger, Inc.,*
  430 F.3d 1036 (9th Cir. 2005) ................................................. 33, 35, 36

*Neal v. Farmers Insurance Exchange,*
  582 P.2d 980 (Cal. 1978) ................................................................... 61

*Obrey v. Johnson,*
  400 F.3d 691 (9th Cir. 2005) ....................................................... 24, 55

*Penguin Group (USA) Inc. v. Steinbeck,*
  537 F.3d 193 (2d Cir. 2008) .......................................... 14, 17, 28, 38

*Penguin Group (USA) Inc. v. Steinbeck*,
    No. 06 Civ. 2438, 2009 WL 4588748 (S.D.N.Y. Dec. 2, 2009) ............ 14

*Rufo v. Simpson*,
    103 Cal. Rptr. 2d 492 (Cal. Ct. App. 2001) ......................................... 61

*Sade Shoe Co. v. Oschin & Snyder*,
    209 Cal. Rptr. 124 (Cal. Ct. App. 1984) .............................................. 47

*SAS Institute Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) ......................................................................... 32

*Seeley v. Seymour*,
    237 Cal. Rptr. 282 (Cal. Ct. App. 1987) .............................................. 69

*State Farm Mutual Auto Insurance Co. v. Campbell*,
    538 U.S. 408 (2003) .................................................................. 56, 57, 63

*Steinbeck v. McIntosh & Otis, Inc.*,
    433 F. Supp. 2d 395 (S.D.N.Y. 2006) ..................................... 13, 14, 26

*Steinbeck v. McIntosh & Otis, Inc.*,
    No. 04 Civ. 5497, 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009) ..... 14, 29

*Steinbeck v. Kaffaga*,
    702 Fed. App'x 618 (9th Cir. 2017) ............................................... 18, 30

*Steinbeck v. Steinbeck Heritage Foundation*,
    400 Fed. App'x 572 (2d Cir. 2010) ............................................ 9, 14, 31

*Sumner Hill Homeowners' Association, Inc. v.*
*Rio Mesa Holdings, LLC*,
    141 Cal. Rptr. 3d 109 (Cal. Ct. App. 2012) ................................. 43, 69

*The Ray Charles Foundation v. Robinson*,
    919 F. Supp. 2d 1054 (C.D. Cal. 2013) ......................................... 36, 37

*United States v. Gonzales*,
    520 U.S. 1 (1997) ................................................................................. 32

## Statutes

17 U.S.C. § 303 .................................................................................. 7

17 U.S.C. § 304 ........................................................................... *passim*

17 U.S.C. § 304(a)(1)(C)................................................................. 7

17 U.S.C. § 304(c) ....................................................................... *passim*

17 U.S.C. § 304(c)(2) ..................................................................... 11

17 U.S.C. § 304(c)(5) ................................................................. *passim*

17 U.S.C. § 304(d) ....................................................................... *passim*

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1332(a)(1)..................................................................... 1

Act of Mar. 4, 1909, ch. 320, § 23, 35 Stat. 1075..................................... 6

Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 251.......................... 7

Cal. Code Civ. Proc. § 3294(a)............................................................ 57

Sonny Bono Copyright Term Extension Act of 1998,
    Pub.L. No. 105-298, 112 Stat. 2827 ........................................ 7

## Other Authorities

Peter S. Menell & David Nimmer,
    *Judicial Resistance to Copyright Law's Inalienable Right to
    Terminate Transfers*,
    33 Columbia Journal of Law & Arts 227 (2009)................................ 33

3 Melville B. Nimmer & David Nimmer,
    Nimmer on Copyright § 11.02[A][2] (2000 ed.) ................................ 39

Edward E. Weiman, et al.,
    *Copyright Termination for Noncopyright Majors:
    An Overview of Termination Rights and Procedures*,
    24 Intell. Prop. & Tech. L.J. 3 (Aug. 2012) ........................................ 26

Webster's Third New International Dictionary (1976)........................... 32

## INTRODUCTION

This case involves a copyright dispute with a tortuous history, including a messy record due in part to sincere pro se filings. Compounding the confusion are the complexity of termination rights under the Copyright Act and the nuanced holdings of the prior Steinbeck decisions. The result is reversible error.

There are two main issues. The first is whether Gail and Thom Steinbeck had, or reasonably believed they had, termination rights to certain Steinbeck copyrights under 17 U.S.C. § 304(c) and § 304(d). Elaine Steinbeck's Estate claims that the earlier Second Circuit litigation definitively decided the termination rights issue, and thus who controls the Steinbeck Works, under the 1983 Agreement. But that prior litigation did not decide if the 1983 Agreement was an "agreement to the contrary," under § 304(c)(5). The Estate even acknowledged—in a parallel case before the same trial judge—that "the issue was not resolved by the Second Circuit."

The termination rights issue was critical to Gail and Thom's defenses. Without being able to present evidence or argument on that topic, Gail's hands were tied at trial trying to defend against the

allegations of breach of contract, slander of title, and intentional interference with prospective economic advantage. If she could have shown that the 1983 Agreement is an "agreement to the contrary"—or even presented evidence about her basis for believing it was—she could have defended against the contract and tort claims.

The second issue concerns the awards of damages. The jury's award of over $13 million is not supported by substantial evidence and erroneous on several grounds. The punitive damages award of almost $8 million is not supported by clear and convincing evidence, as Gail and Thom did not act with malice, oppression, or fraud. Punitive damages were grossly excessive and unnecessary, and the Estate did not meet its evidentiary burden on Gail's ability to pay.

In addition, the jury's award of compensatory damages is legally flawed and lack substantial evidence support. Damages for breach impermissibly rests largely on the same conduct that purported to prove the two tort claims. The damages award for intentional interference with prospective economic advantage was based on speculation and unsupported. There was no evidence that an alleged slander of title caused any damage.

## JURISDICTIONAL STATEMENT

This is an appeal from the final judgment of the U.S. District Court for the Central District of California. The district court had subject matter jurisdiction over the civil action under 28 U.S.C. § 1332(a)(1).

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. The district court entered summary judgment on several claims on November 1, 2016. ER0031–0059. The court also issued several interlocutory evidentiary orders. *See* ER0018–0030. The jury reached its verdict on September 5, 2017. ER0011–0017. The district court ruled on post-trial motions on February 9 and 13, 2018. ER0005–0010. Final judgment after the jury trial was entered on March 15, 2018. ER0001–0004. The notice of appeal was filed on March 14, 2018. ER0060–0084.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in excluding evidence, argument, and defenses relating to whether the 2004 Litigation and whether the 1983 Agreement is an "agreement to the contrary" under 17 U.S.C. § 304(c) and (d).

2. Whether the district court erred in denying judgment as a matter of law and denying remittitur or a new trial on the jury's punitive damages award in the amount of $7.9 million.

3. Whether the district court erred in denying judgment as a matter of law that the damages award for breach of contract and the tort claims was not supported by substantial evidence.

4. Whether the district court erred in denying judgment as a matter of law that the damages award for slander of title was not supported by substantial evidence.

## CONCISE STATEMENT OF THE CASE AND FACTUAL BACKGROUND

### I.     Procedural Background

The district court action began on November 10, 2014.  ER1688 (Dkt. No. 1).  Before trial, in November 2016, the court granted partial summary judgment in favor of the Estate.  ER0046–0059.  The court granted judgment in favor of the Estate on its breach of contract claim and its slander of title claim.  *Id.*  The court denied judgment on the intentional interference claim.  *Id.*  The court also denied Gail's motion for reconsideration of the summary judgment order.  *Id.*

After summary judgment, the district court made additional relevant rulings, including denying Gail and Thom's motion for reconsideration of summary judgment, ER0039–0040; granting the Estate's motion for sanctions, ER0033–0036, ER0041–0045; and other

orders limiting the evidence, witnesses, and argument Gail could offer as part of their defense, *see* ER0028–0030.

Based on those evidentiary orders, trial proceeded on the limited issues of liability for the intentional interference claim and damages for all three claims. After the trial, the jury entered a verdict, finding liability for the intentional interference and awarding damages as follows:

- $1.3 million for Plaintiff's breach of contract claim;

- $1.3 million for Plaintiff's slander of title claim;

- $2.65 million for Plaintiff's intentional interference of prospective economic advantage claim; and

- $7.9 million for punitive damages, including $5.9 million assessed against Gail Steinbeck individually.

ER0011–0017.

Appellants filed a renewed motion for judgment as a matter of law and a motion for a new trial or remittitur. The district court denied those motions. ER0005–0010. The court entered final judgment on March 15, 2018. ER0001–0004.

## II.   Factual Background

### A.   The Steinbeck Works, the Parties, and the Statutory Background

John Steinbeck was a prolific writer known for many classics of American literature.  He won the Nobel Prize for Literature in 1962. During Steinbeck's lifetime, the 1909 Copyright Act was the operative law.  *See* Act of Mar. 4, 1909, ch. 320, § 23, 35 Stat. 1075 (1909).  Under the 1909 Act, copyright protection was for 28 years, with a renewal period of 28 years, yielding total possible protection for 56 years.

In 1968, through his will, Steinbeck passed, to his third wife Elaine, his copyright interests and the royalty payments (referred to as his "Works" or the "Steinbeck Works").  ER1333-1336.  Steinbeck left money but no intellectual property rights to his sons Thom and John IV.  *Id.*  As a result of Steinbeck's will, at that time Elaine owned outright, and had the sole right to royalties derived from, certain Works referred to as the Early Works.[1]   *Id.*   In contrast, with the Late Works,[2] Elaine and

---

[1] The Early Works are the works for which Steinbeck had renewed the copyrights before he died in 1968.  *See* ER1334-1335.  Relevant to the present appeal, the Early Works include *The Grapes of Wrath.*  *Id.*

[2] The Late Works are those works for which the copyright had not yet been renewed when John Steinbeck died in 1968.  *See* ER1334-1335.  As

- 6 -

Steinbeck's two sons, Thom and John IV, shared equally, the "renewal" rights for Late Works that had not yet been renewed. *See* 17 U.S.C. § 304(a)(1)(C).

In 1974, Elaine, Thom, and John IV entered into a royalty distribution agreement (the "1974 Distribution Agreement") under which Elaine received 50 percent and Thom and John IV each received 25 percent of the Late Works royalties. ER1336.

Two years later, Congress changed the copyright law. *See* Copyright Act of 1976, Pub. L. No. 94–553, 90 Stat. 251 ("1976 Act") (effective 1978). Congress eliminated the fixed term followed by a renewal term and replaced it with a single 75-year term for all copyrights created after January 1, 1978. As relevant here, works published or registered before January 1, 1978 are protected for the lesser of 75 years from the publication date or 100 years from the creation date. 17 U.S.C. § 303.

The 1976 Act also created termination rights. *See* 17 U.S.C. § 304(c). Termination rights permit an author or their heirs to terminate

---

relevant to the present appeal, the Late Works include *The Moon Is Down* and *East of Eden*.

a prior assignment or license of copyrighted works. The purpose is to allow the author or heirs to capture the increased value of the protected works. The termination rights also enabled authors and their heirs to improve the financial arrangements given the additional twenty years of term added with the 1976 Act.

In 1998, Congress again amended the Copyright Act. *See* Pub.L. No. 105–298, 112 Stat. 2827 (1998). Another termination right was created, exercisable during a five-year window opening 75 years after the first publication of a copyrighted work. The copyright term was also extended by 20 years.

## B. The 1983 Agreement

After the 1976 Act, the Steinbeck heirs disagreed about aspects of Steinbeck Works and associated royalties. Thom and John IV sued Elaine in 1981 over the 1974 Distribution Agreement, arguing that it was the product of fraud and misrepresentation. ER1336–1337. The parties settled after the district court's grant of summary judgment, the result being the 1983 Agreement. ER1337.

The 1983 Agreement purported to transfer control of Thom's rights, including his future termination rights, in exchange for a higher

percentage of royalties. ER1568–1581. Specifically, Paragraph 5 of the 1983 Agreement provided, in relevant part:

> Elaine Steinbeck and/or her agent shall have the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which John Steinbeck IV and Thom Steinbeck have or will have renewal or termination rights.

ER1571.[3]

This provision was later analyzed by the Second Circuit in the context of whether the agreement created an agency relationship between Elaine and the Steinbeck sons, which would have imposed fiduciary obligations on Elaine. *See Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. App'x 572, 575 (2d Cir. 2010). No agency relationship was formed, that court said, because the agreement "forecloses any argument that the parties intended the Steinbeck sons to retain control over Elaine Steinbeck's exercise of the authority conferred upon her, as would be necessary to create an agency relationship." *Id.*

---

[3] The 1983 Agreement also required powers of attorney to be executed and designated McIntosh & Otis ("M&O") as the "literary agent to administer . . . all copyrights and rights deriving therefrom in the works of John Steinbeck." ER1571.

The Second Circuit did not say whether the 1983 Agreement validly transferred termination rights in view of 17 U.S.C. § 304(c) and (d).

## C.    Developments Between 1983 and 2004

Further developments occurred between 1983 and 2004. After John IV died in 1991, his daughter Blake Smyle and his former wife Nancy Steinbeck started receiving a percentage of his share of the royalties. ER1338–1339.

In 1995–1996, Thom married Gail, and they formed Palladin Group Inc., a management/production company. ER1331; ER0423. As Thom's health declined, he later executed powers of attorney, appointing Gail as his attorney-in-fact to manage his business and ownership interests in the Steinbeck Works. *Id.* Thom died in 2016.

In 2003, Elaine died and left her interests in the Steinbeck Works to her daughter Waverly Scott Kaffaga[4] and other named beneficiaries. ER1338–1339. Waverly manages Elaine's estate. After Elaine's death, Thom and Blake owned all contingent termination rights under 17 U.S.C. § 304.

---

[4] Kaffaga is John Steinbeck's step-daughter.

### D.   *The Grapes of Wrath* Film Rights

One copyright interest at issue is the domestic film rights for *The Grapes of Wrath*.   *See* ER1349–1357; ER1472–1479.   *The Grapes of Wrath* was originally copyrighted in 1939 when the book was first published.   ER1472–1479. That same year, Steinbeck assigned the film rights to Twentieth Century Fox.   *Id.*   When he died, the royalty stream for *The Grapes of Wrath* film rights flowed to Elaine, but the ownership rights remained with Twentieth Century Fox.   This remained true for the domestic film rights until 1998.

When the 1976 Act created termination rights, John Steinbeck's heirs, including Thom, gained the statutory right to recapture ownership in the domestic film rights to *The Grapes of Wrath*.   In 1998, Elaine and Thom exercised their right to terminate the grant to Twentieth Century Fox.[5] Once the grant was terminated, those domestic film rights reverted to the three statutory heirs, Elaine, Thom, and Blake.   *See* 17 U.S.C. § 304(c)(2).   *The Grapes of Wrath* film rights became "recaptured rights."

---

[5] In 1998, the statutory heirs were Elaine, Thom, and Blake, as John IV had died in 1991.

- 11 -

The recaptured *The Grapes of Wrath Rights* film rights would become the genesis of another future dispute. Thom would later have reason to believe that he owned his rights with no obligation to Elaine (or later her Estate). Elaine (and later the Estate), on the other hand, now contend that control over those recaptured rights transferred to Elaine exclusively under the 1983 Settlement Agreement and the accompanying powers of attorney.

Elaine's death in 2003 added uncertainty about the copyright ownership. Thom believed that control over some Steinbeck Works, including the domestic film rights for *The Grapes of Wrath*, reverted to Thom and Blake as the only heirs under 17 U.S.C. § 304(c), particularly because, in Thom's view, the power of attorney was no longer controlling. As for the Steinbeck Works, no court had decided the question of who owned them in view of the statutory termination rights and whether the 1983 Agreement superseded the statute. *See infra.*

E.  ***East of Eden* Film Rights**

A second copyright ownership at issue is for *East of Eden*, first published and copyrighted in 1953. ER1342. The film rights were licensed to Warner Brothers in 1953 and made into the 1955 Academy

Award-winning film starring James Dean. In 2004, Thom and the Estate formed an agreement with Warner Brothers for the 1955 film's distribution during the renewal term. That same year, the parties signed an option agreement with Universal/Imagine for a new film version of *East of Eden*.

### F. The 2004 Steinbeck Litigation

After Elaine's death in 2003, Thom (with Blake) exercised what he believed were his statutory termination rights. See generally 2004 Litigation, *infra*. Thom sent termination notices for earlier grants of rights John Steinbeck made. One notice was the Penguin Termination Notice, applicable to the 1938 publishing agreement giving the Penguin Group's predecessor the right to publish the Steinbeck Works, including *The Grapes of Wrath*.[6] Thom also sent termination notices for rights in *The Red Pony*, *The Long Valley*, *Cannery Row*, and *The Wayward Bus*.

In June 2004, Thom (along with Blake) and the Estate (along with others) brought claims against each other over the termination notices. *See generally Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395

---

[6] This termination notice is separate from the notice for *The Grapes of Wrath* domestic film rights.

(S.D.N.Y. 2006). Known as the 2004 Litigation, the case involved multiple claims, including breach of fiduciary duty, promissory estoppel, and unjust enrichment. *Id.* at 575–79.

Several Court opinions came from the 2004 Litigation. *See Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. App'x 572 (2d Cir. 2010) (non-precedential); *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 Civ. 5497, 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009); *Penguin Grp. (USA) Inc. v. Steinbeck*, No. 06 Civ. 2438, 2009 WL 4588748 (S.D.N.Y. Dec. 2, 2009); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008); *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395 (S.D.N.Y. 2006). The 2004 Litigation resolved some but not all questions overhanging the 1983 Agreement. *See infra.* Importantly, the 2004 Litigation did not address the issue of whether the 1983 Agreement was "an agreement to the contrary." *See infra.*

### G. Disputes Arose Again in 2014 About the Ownership of Certain Steinbeck Works

#### 1. Thom Steinbeck Sued the Estate to Seek Clarity on Certain Rights (the "Parallel Litigation")

In 2013, Thom and Gail learned that M&O had granted a license to the movie studio DreamWorks to produce a motion picture based on *The*

*Grapes of Wrath*. ER1349–1350. To shore up any perceived concerns with chain of title, DreamWorks brought Thom and Gail on board. ER0955–0980.

Thom and Gail's services were retained under an executive producer agreement captioned as "side deal" to the main agreement with the Estate. *Id.* Steven Spielberg "immediately thought that it was a great idea" and "how great it would be for the project." ER1000. The fee paid to Thom and Gail did not come out of any money DreamWorks would have used to pay for *The Grapes of Wrath* film rights. ER0960–0962.

Given the prior litigation, Thom and Gail were negotiating with DreamWorks separately from the Estate and under a confidentiality agreement. *See, e.g.*, ER0380–0382. Thom and Gail also communicated with DreamWorks about their understanding of the ownership of rights. *See* ER0962–972. Even so, Chris Floyd of DreamWorks later explained: "The whole point of this [*i.e.*, the executive produce side deal] would be that since we already paid for the executive producing services, I wouldn't have to pay any extra money for . . . any rights." ER0975; ER1015. At the time of trial, *The Grapes of Wrath* movie project was on track, with a third draft of the script in place. ER0433.

Around this same time, the Estate was negotiating with Universal Pictures and Imagine Entertainment (collectively "Universal") for *East of Eden* film rights. Thom and Gail disagreed with the proposed terms of the agreement and also believed they had termination rights to the film rights under 17 U.S.C. § 304(d). *See* ER1342–1349. With an eye towards improving the deal and perfecting chain of title, Gail contacted Anna Culp at Imagine, trying to leverage the termination rights to improve the deal. ER0569–0580; *see also* E0478–0480. Had termination occurred, Thom and Gail believed the film rights would revert solely to Thom and Blake—the only remaining statutory heirs under § 304(d).

Universal later halted the *East of Eden* film deal, due at least in part to Gail's negotiation attempts. But there were other possible reasons, as no long-form contract was signed, "not very many negotiations" turn into an option agreement, and only a "handful" of optioned rights are actually purchased for the full purchase price. *See* ER0557 (Ichino testimony). Indeed, Universal had optioned *East of Eden* in 2003 but let the option expire. *Id.*

Based on this and other activities relating to the Steinbeck Works, Thom (along with Blake Smyle) filed an action in the Central District of

California in November 2014 ("the Parallel Litigation") based on what Thom believed were the Estate's violations of his ownership interests in some of the Steinbeck Works. *See* First Amended Complaint, *Steinbeck v. Kaffaga*, No. 2:14-cv-08681-PJW (C.D. Cal. Mar. 27, 2015), Dkt. No. 21. Judge Hatter presided over the Parallel Litigation as well as this case on appeal.

The Estate responded by moving to dismiss. *See* Memorandum of Points and Authorities in Support of the Estate Defendants' Motion to Dismiss, *Steinbeck v. Kaffaga*, No. 2:14-cv-08681 (C.D. Cal. June 1, 2015), Dkt. No. 60. The Estate argued that the 1983 Agreement controlled the Works at issue. *Id.* The Estate did not argue that Thom was collaterally estopped from making the claims. *Id.* In fact, the Estate recognized that, in the earlier litigation, "the Second Circuit had expressly declined to rule on the question of whether the 1983 Settlement Agreement was an 'agreement to the contrary,' concluding that the issue was "immaterial to the resolution of this appeal." *Id.* (quoting *Penguin Grp.*, 537 F.3d at 203 n.5).

After briefing, Judge Hatter granted the motion to dismiss. He ruled that the "action is barred by collateral estoppel," even though the

parties had not briefed that issue. Order, *Steinbeck v. Kaffaga*, No. CV 14-08681 TJH (C.D. Cal. Aug. 11, 2015), Dkt. No. 80. Thom then appealed that decision to this Court, which affirmed in a non-precedential decision. *Steinbeck v. Kaffaga*, 702 Fed. App'x 618 (2017).

### 2. The Estate Responded by Suing Gail and Thom, and the Estate was Awarded Over $13 Million

Days after the Parallel Litigation started, the Estate responded by suing Gail and Thom. ER1688 (Dkt. No. 1). The Estate alleged several causes of action, including breach of contract, slander of title, and intentional interference of economic advantage. *Id.* According to the Estate, Thom had breached his obligations under the 1983 Agreement by claiming ownership and control of certain Steinbeck Works. *Id.*

The Estate also alleged that Gail and Thom had interfered with deals to make movies of *The Grapes of Wrath* and *East of Eden*. *Id.* First, the Estate claimed an economic relationship with Universal Pictures and Imagine Entertainment ("Universal/Imagine") based on on-going negotiations over film rights to *East of Eden*. Second, the Estate claimed

an economic relationship with DreamWorks based on an option agreement for a film of *The Grapes of Wrath*.[7]

The Estate moved for summary judgment, asking for a declaratory judgment that it controlled the Steinbeck Works and it owned the Early Works. *See* ER0046–0059; ER0041–0045. The Estate also moved for judgment on the breach of contract, slander of title, and intentional interference claims. *See id.* In November 2016, the trial court granted partial summary judgment, ruling that the Estate was entitled to judgment on breach of contract and slander but not intentional interference. ER0046–0059.[8]

After summary judgment, the court continued to enter rulings limiting the evidence and argument Gail and Thom could offer in their defense. *See* ER0018–0030. For instance, the court precluded Gail and Thom "from presenting any argument, evidence or testimony on issues

---

[7] The Estate's complaints also referenced Thom and Gail's activities relating other Steinbeck Works, including *Flight*, *The Moon Is Down*, *The Pearl*, and *The Long Valley*. See ER00716–0725;

[8] The judgment on slander of title was partial with respect to "non-RWSG petition-related" communications. ER0059. The court held that the "RWSG petition-related" communications were immunized. *Id.* at 0055. The latter basis for the slander claim was later abandoned by the Estate and is not at issue in the appeal.

that have already been decided by the courts in the 2004 Litigation or by this Court on summary judgment and/or reconsideration, in the absence of an order from this Court authorizing the presentation of such argument, evidence or testimony." ER0028–0030 (June 28, 2017 Order). The district court reaffirmed this order on August 25, 2017. *See* ER0018–0021.

During trial, each party presented witnesses and argument before the jury. The Estate presented the following witnesses: Waverly Kaffaga, ER0227–0447; Gail Steinbeck (as an adverse witness), ER0448–0529; Elizabeth Rubinstein, President of M&O, ER0455–0530; Masako Ichino, VP of Business Affairs at Universal Pictures, ER0531–0557; Anna Culp, an executive vice-president at Imagine, ER0556–0596; and Kathryn Arnold, the Estate's damages expert, ER0641–0736, ER0754–0851. Gail presented Craig Wagner, general counsel at Paradigm Talent Agency, ER0854–0911; Jonathan Sanger, a Hollywood producer, ER0911–0919; Chris Floyd, General Counsel for DreamWorks, ER0929–1024; Edwin Elbert, a Hollywood producer, ER1024–1058; Robert Bookman, a Hollywood producer and Thom's former talent agent, ER1112–1132; and Gail Steinbeck, ER1132–1166.

After the close of evidence, the jury found in the Estate's favor. The jury awarded over $13 million in damages: $1.3 million for the breach of contract claim; $1.3 million for the slander of title claim; $2.65 million for the intentional interference claim; and $7.9 million in punitive damages. ER0001–0004. Gail moved for judgment as a matter of law, a new trial, and/or remittitur, which the district court denied. ER0005–0007.

This appeal follows.

## SUMMARY OF THE ARGUMENT

First, the trial court erred in granting summary judgment. The court incorrectly believed that the 2004 Litigation had resolved whether the 1983 Agreement is an "agreement to the contrary," under 35 U.S.C. § 304(c) and (d). Without making that decision, the court incorrectly held that Thom and Gail breached the agreement and slandered the Steinbeck Works.

When § 304 is correctly interpreted, the 1983 Agreement must be understood as an "agreement to the contrary." As such, the agreement could not have prevented Thom from exercising any termination rights he had under the Copyright Act. Thom and Gail's actions could not be tortious or constitute a breach because Thom and Gail had ownership

and control over at least some of the Steinbeck Works. The 1983 Agreement is unenforceable to the extent it purports to limit Thom's exercise of his statutory termination rights.

Second, even if Thom and Gail were mistaken about the interpretation of § 304 and the 1983 Agreement, the court committed prejudicial error by excluding evidence about the prior Steinbeck litigations. Judge Hatter viewed anything related to the 2004 Litigation as merely rehashing a settled issue. But that evidence spoke directly to whether the Estate proved intentional interference and whether clear and convincing evidence supported punitive damages. Gail's reasonable (mis)understanding—particularly given the complexity of termination rights and the history of this litigation itself—was highly probative of malice or fraudulent intent—necessary for punitive damages.

Third, the damages awards were legally erroneous and unsupported by substantial evidence. Punitive damages of almost $8 million against Gail and her company are unnecessary, financially devastating, and a deprivation of property. More importantly, the Estate failed to meet its burden of clear and convincing evidence and its burden

to offer sufficient evidence of Gail's financial means to support such a staggering punitive award.

The $5.25 million compensatory damages is not supported by substantial evidence. The conduct forming the basis for the breach claim is essentially the same conduct supporting the tort claims—leading to impermissible double damages for the same act. Any damages based on lost profits is speculative.

As for slander damages, the Estate's expert failed to conduct the necessary analysis—determining whether the Steinbeck Works were devalued by Gail and Thom's actions. There was no analysis of loss of goodwill—beyond general assertions. Thus, the award lacks substantial evidence support.

## ARGUMENT

### III. Standards Of Review

A district court's summary judgment is reviewed *de novo*. *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013). Underlying factual determinations are reviewed for clear error. *Id.*

This Court "review[s] evidentiary rulings for abuse of discretion and reverse if the exercise of discretion is both erroneous and prejudicial."

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014);

*Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)

(reversible error requires only that "an error in a civil trial need only be

more probably than not harmless."); *accord Obrey v. Johnson*, 400 F.3d

691, 700–01 (9th Cir. 2005) ("[W]hen reviewing the effect of erroneous

evidentiary rulings, we will begin with a presumption of prejudice.").

The district court's denial of a motion for a new trial is reviewed for

abuse of discretion. *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d

1042, 1046 (9th Cir. 2009).

## IV. The District Court Erroneously Excluded Evidence And Argument About Whether The 1983 Agreement Is An "Agreement To The Contrary" And About Gail Steinbeck's Genuine Belief Of Having Termination Rights

The district court erroneously excluded evidence and argument

about whether the 1983 Agreement was an "agreement to the contrary."

The court's decisions created reversible error be creating a prejudicial

view of Thom's statutory termination rights under 17 U.S.C. § 304. This

is reversible error for two reasons.

First, the court should have denied summary judgment and held

that the 1983 Agreement was an "agreement to the contrary." That

would have been a defense to at least some of the Estate's causes of

actions because Gail was an owner of certain rights in some Steinbeck Works, including the domestic film rights to *The Grapes of Wrath*.

Second, even if the 1983 Agreement is not an "agreement to the contrary," Gail should have been allowed to present her evidence and argument about why she believed it was an "agreement to the contrary" and why she believed she had valid termination rights. Her bona fide and reasonable belief was evidence directly relevant to the Estate's claim of intentional interference of prospective economic advantage. It was also relevant to whether there was clear and convincing evidence to support punitive damages.

## A. The 1983 Agreement is an Agreement to the Contrary

### 1. No court has ever held that the 1983 Agreement is not an "agreement to the contrary"

Critical to Gail's defenses and counterarguments was her contention that the 1983 Agreement was an "agreement to the contrary" under 17 U.S.C. § 304(c) and (d). Gail argued that it was, seeking rehearing on the issue, which lead to sanctions from Judge Hatter. *See* ER0033–0036.

Judge Hatter erroneously concluded that the prior litigations had decided this issue. His misunderstanding is understandable, given the

inherent complexity of copyright termination rights. *See, e.g.*, Edward E. Weiman, et al., *Copyright Termination for Noncopyright Majors: An Overview of Termination Rights and Procedures*, 24 Intell. Prop. & Tech. L.J. 3, 4 (Aug. 2012) ("Not since anyone studied the Rule against Perpetuities in law school has there been so much confusion over the operation of what might seem to be a nearly impenetrable set of rules, subrules, exceptions, and complicated timing issues."). In addition, Gail's pro se opposition to the summary judgment was not the gold-standard in advocacy. *See* ER1652.

But when the earlier *Steinbeck* opinions are understood for what they hold, it becomes clear that no court has expressly held that the 1983 Agreement is not an "agreement to the contrary." In fact, the only opinion to expressly address this concluded that the 1983 Agreement would be void if read to "limit[] or extinguish[] Thom's and Blake's statutory termination rights." *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 295, 404 n.30 (S.D.N.Y. 2006).

In the Parallel Litigation before Judge Hatter, the Estate explicitly stated that the Second Circuit had not ruled on whether the 1983 Agreement was an "agreement to the contrary." There, the Estate stated:

> Moreover, the Second Circuit expressly declined to rule on the question of whether the 1983 Settlement Agreement was an "agreement to the contrary," concluding that the issue was "immaterial to the resolution of this appeal." *Penguin Grp.*, 537 F.3d at 203 n.5.

Memorandum of Points and Authorities in Support of the Estate Defendants' Motion to Dismiss, *Steinbeck v. Kaffaga*, No. 2:14-cv-08681 (C.D. Cal. June 1, 2015), ECF No. 60, at 11–20.

Yet the Estate devoted pages of its motion to dismiss and its reply arguing that the 1983 Agreement is not an "agreement to the contrary." *See id.*; *see also* Reply Memorandum of Points and Authorities in Support of the Estate Defendants' Motion to Dismiss, *Steinbeck v. Kaffaga*, No. 2:14-cv-08681-TJH-FFM (C.D. Cal. July 15, 2015), Dkt. No. 75. The Estate was adamant that the 1983 Agreement was a live, undecided issue.

In 2006, Judge Owen had concluded that the 1983 Agreement was not enforceable if it purported to divest Thom and John IV of their rights to termination:

> Disturbingly, the settlement agreement also purported to grant Elaine the exclusive right to exercise Thom and John IV's termination rights over the Steinbeck works.

> \* \* \*

> If this theory is meant to suggest that the terms of the 1983 Settlement Agreement void all of Thom's and Blake's termination rights—that Elaine successfully contracted away the rights of these statutory heirs when she settled litigation with them—it is barred by the plain language of 17 U.S.C. § 304(c)(5) and (d)(1). Any portion of the settlement agreement which limits or extinguishes Thom's and Blake's statutory termination rights is invalidated as a statutorily-prohibited "agreement to the contrary."

*Id.* at 404 n.28, n.30.

Judge Owen's decision was appealed, but only a portion of it, which the appeals court held that the "Penguin Termination Notice" was invalid. *Penguin Grp.*, 537 F.3d at 200, 202. It also held that Elaine's 1994 agreement with Penguin was not an "agreement to the contrary" under § 304(c)(5) because that phrase should not be read "so broadly that it would include any agreement that has the effect of eliminating a termination right." *Id.* at 202. And the Second Circuit noted that, although it was "unclear" whether the 1983 Agreement limited Thom and Blake's ability to send any termination notice, that issue was "immaterial to the resolution of this appeal." *Id.* at 203 n.5.[9]

---

[9] The Second Circuit also observed that, "[a]lthough [Elaine] possessed a power of attorney to exercise the Steinbeck Descendants' termination rights as a result of a 1983 settlement, it is unclear that her exercise of those rights would have been valid." 537 F.3d at 203 n5. The court did

On remand, the 2004 Litigation was assigned to Judge Daniels, who granted the Estate's motion for summary judgment on some of their remaining claims. *Steinbeck*, 2009 WL 928189, at *12. In dismissing Thom and Blake's claims on remand, Judge Daniels recognized that the "agreement to the contrary" "issue was not resolved by the Second Circuit." *Id.* at *7 n.10.

Judge Daniels's decision was then appealed based on stipulations which excluded from appeal any issues relating to *The Grapes of Wrath* or *East of Eden*. The Second Circuit ultimately affirmed. 400 Fed. App'x 572, 579 (2d Cir. 2010). The Second Circuit's 2010 decision rendered only the issues of breach of fiduciary duty, promissory estoppel, unjust enrichment, constructive trust, and possible termination of M&O. *Id.* at 575–79. The court again did not rule on whether the 1983 Agreement was within the "agreement to the contrary" provision of § 304. *See id.*

Despite the above analysis and the Estate's representation in the Parallel Litigation that the 1983 Agreement issue was live, Judge Hatter ruled in the Parallel Litigation that Gail's action was barred by collateral

---

not resolve that issue. *Id.* ("But the resolution of these speculations is immaterial to the resolution of this appeal.").

estoppel. *Steinbeck v. Kaffaga*, No. CV 14-08681 TJH (FFMx) (C.D. Cal. Aug. 11, 2015), Dkt. No. 80. This was surprising because even the Estate's briefs did not argue for collateral estoppel. Judge Hatter's entire analysis reads:

> Plaintiffs have litigated these claims *ad nauseum*. Plaintiffs are attempting to use this Court, after having exhausted their attempts in the Second Circuit, to revoke the validity of the 1983 agreement to recover rights to the Steinbeck Works, after Plaintiffs, cognizant of the value inherent in copyrights of the Steinbeck Works, signed over control and authority to Elaine Steinbeck (Estate).
>
> This action is barred by collateral estoppel.

*Id.* (citations omitted).

The confusion about what had actually been decided may have been exacerbated by Thom's pro se appeal.[10] In a non-precedential decision, this Court accepted Judge Hatter's characterization of the dispute. *Steinbeck v. Kaffaga*, 702 Fed. App'x 618, 619 (9th Cir. 2017).[11] But even that decision does not expressly say whether the 1983 Agreement is an

---

[10] Thom was a Vietnam veteran who suffered from chronic obstructive pulmonary disease. ER1142–1144. He was experiencing severe health issues during the litigation, including during his deposition. ER1671; ER1747–1748. He died in August 2016.

[11] The panel in that case comprised Circuit Judges Nguyen and Hurwitz and Judge Richard K. Eaton of the U.S. Court of International Trade.

"agreement to the contrary." It relies on language from the Second Circuit's *Steinbeck Heritage Foundation* decision, but, as explained above, that 2010 decision left the question unanswered.

### 2. If the Court takes up the issue, the 1983 Agreement should be deemed an "agreement to the contrary"

Here, the district court never issued a decision holding that the 1983 Agreement is an "agreement to the contrary." The court instead granted summary judgment and made evidentiary rulings premised on a misunderstanding of the prior litigations.

Because the issue was never expressly decided by Judge Hatter, this Court may prefer to remand so the district court can so rule in the first instance. Indeed, the record is not entirely clear which Works Gail and Thom could have established are free and clear from the 1983 Agreement. That said, if the Court does decide the issue, the 1983 Agreement should be held to be an "agreement to the contrary."

Turning to the statute, the plain text of § 304(c)(5) is unambiguous. The statute expressly overrides any agreement that purports to encumber the right to terminate. *See* 17 U.S.C. § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future

grant."). The statute expressly nullifies any agreement "to make any future grant."

Following the statutory definitions contained in 17 U.S.C. § 101, "the term 'including' is 'illustrative' not 'limitative'" and thus "the term 'agreement[s] to the contrary' under §304(c)(5) [must be interpreted] as inclusive of agreements other than the two examples Congress explicitly mentioned." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 938 (9th Cir. 2008). And the term "any" is all inclusive. *See SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1351 (2018) ("[T]he word 'any' ordinarily implies every member of a group."); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New International Dictionary 97 (1976))). Under the statute's plain meaning, a statutory heir to termination rights may exercise those rights despite any contractual arrangement purporting to divest or encumber those inalienable rights.

The plain, unambiguous text should be the end of the analysis. Indeed, the language creates an inalienable right, and the plain meaning of the text should control. Thus, the text of the § 304(c)(5) evinces

Congress's intent to create an absolute, inalienable opportunity for authors and their successors to recapture a completely new property right by termination. *See* Peter S. Menell & David Nimmer, *Judicial Resistance to Copyright Law's Inalienable Right to Terminate Transfers*, 33 Columbia J.L & Arts 227, 229–30 (2009).

Notwithstanding the unambiguous text, courts have generally taken a narrower view of the scope of § 304(c) and §304(d) and have looked to the legislative intent and purpose. *See, e.g., Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1044 (9th Cir. 2005); *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[W]e find it necessary to go beyond the mere text and consider the legislative intent and purpose of § 304(c) to ascertain the statute's meaning.").

"[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Marvel*, 310 F.3d at 290 (2d Cir. 2002) (citing *Stewart*, 495 U.S. at 230). The Supreme Court has explained the provision's purpose: "[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work

product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 (1985) (footnote omitted). "That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself." *Id.*

The congressional purpose was to remedy what was seen as a deficiency created by *Fred Fisher Music Co., Inc. v. M. Witmark & Sons*, 318 U.S. 643 (1943). In *Fisher*, the Supreme Court upheld an author's assignment of the renewal right to his musical composition, refusing to interpret the 1909 Act as restricting the renewal right's alienability because the statute did not explicitly make the right inalienable. *Id.* at 655–56. *Fisher* was seen as thwarting the 1909 Act's intent to grant authors and their families a future copyright interest. *See Mills Music*, 469 U.S. at 185 (White, J., dissenting).

Current precedent has reached differing outcomes on the application of § 304's "agreement to the contrary" provisions, depending on the particular circumstances and the wording of the agreement at issue. In *Classic Media*, this Court held that a termination right was preserved, even though a post-1978 agreement purported to extinguish the termination right. 532 F.3d at 989.

The *Mewborn* Court left open whether future termination rights can be assigned. *Id.* at 986 n.4 ("Although we need not reach this question, it may be possible for an author or heir to transfer the future rights scheduled to revert upon service of a termination notice, subject to surviving until the time such rights vested in the author or heir."). Thus, this Court in *Mewborn* observed that the issue present here—whether Thom could sign away future contingent termination rights—was an open and unresolved legal question. *See id.*

The 1983 Agreement is also different from the circumstances and agreement at issue in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005). The heir Christopher Milne in *Milne* had the present right to serve an advance notice of termination and could exercise it at any moment. *Id.* at 1040. Christopher then used the leverage of imminent vesting of termination rights to revoke the pre-1978 grant and to enter into a more remunerative new grant of the same rights with the studio. *Id.* at 1044–45. By taking action tantamount to the statutory formalities, Christopher achieved the exact policy objectives for which § 304(c) was enacted. *See id.*

Indeed, the agreement reached in *Milne* was not an "agreement to the contrary" because "[t]he avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the congressional purpose underlying them." *Mewborn*, 532 F.3d at 987 (summarizing *Milne*). Thus, the holding and reasoning of *Milne* does not run contrary to a ruling that the 1983 Agreement is an "agreement to the contrary."[12]

The reasoning of *Milne* supports a conclusion that the 1983 Agreement is an "agreement to the contrary." If read as the Estate suggests, then the agreement would frustrate some heirs' ability to use their statutory right to terminate a prior grant and negotiate a better agreement with a publisher or a studio.

The decision in *The Ray Charles Foundation v. Robinson*, 919 F. Supp. 2d 1054 (C.D. Cal. 2013), also supports a textual application of § 304(c)(5). There, the singer Ray Charles made an agreement with his

---

[12] This Court's non-precedential decision in *Larson v. Warner Brothers Entertainment, Inc.*, 640 Fed. App'x 630 (9th Cir. 2016), dovetails with *Milne*. There, the Court held that the statutory heirs, "like the heir in *Milne*, bargained with their statutory termination power in hand to negotiate a highly remunerative new agreement" with the publisher. *Id.* at 633.

twelve children about the copyrights to his many songs. *Id.* at 1060. The agreement tried to limit statutory rights the heirs possessed in Charles's copyrights after his death, including termination rights. *Id.* at 1065. The court rejected this view, concluding that "if the agreements are interpreted to waive [the children's] rights to recapture the copyrights at issue, then they are plainly 'agreement[s] to the contrary' of the Copyright Act's termination provisions and are unenforceable to that extent." *Id.* at 1066.[13]

In the 2004 Litigation, one contested agreement was the 1994 Agreement, between the Steinbeck heirs and a publisher. The heirs used that agreement to reach a better financial arrangement for licensing certain copyrights. As the Second Circuit noted, "the 1994 Agreement obligated Penguin to pay larger guaranteed advance payments and royalties calculated from the 'invoiced retail price of every copy sold by the Publisher,' rather than 'the amount which the Publishers charge for

---

[13] A recent Sixth Circuit decision noted with interest the disagreement between Nimmer and some of the court decisions about the meaning of "agreement to the contrary." *See Brumley v. Brumley & Sons*, 822 F.3d 926, 933 (6th Cir. 2016) ("While the caselaw on this issue appears to be one-sided, it deserves mention that Nimmer on Copyright . . . takes a contrary view.").

all copies sold.'" *Id.* at 200. "The 1994 Agreement also modifies the geographic limits of the publication rights as to the covered works and imposes a requirement on Penguin to keep a greater number of Steinbeck works in print." *Id.* at 201. In short—and consistent with the statutory objective—the Steinbeck heirs used their one opportunity to exercise termination rights against the publisher to obtain a financially more lucrative deal. The 1994 Agreement was therefore not an agreement to the contrary.

*Marvel* has little direct impact here, but its underlying rationale is not inconsistent with Gail's position. There, the parties contractually agreed that to recharacterize an already-created work as a "work made for hire." 310 F.3d at 285. This agreement was an impermissible "after-the-fact relabeling of the nature of the work to eliminate a future exercise of the author's termination right under section 304(c)." *Penguin Grp.*, 537 at 203 (describing *Marvel*). In other words, "*Marvel* concludes only that backward-looking attempts to recharacterize existing grants of copyright so as to eliminate the right to terminate under section 304(c) are forbidden by section 304(c)(5)." *Id.*

At the same time, the *Marvel* court was concerned that such a *post hoc* agreement between an author and a publisher "would likely repeat the result wrought by the *Fred Fisher* decision and provide a blueprint by which publishers could effectively eliminate an author's termination right." *Id.* at 291. The agreement's practical effect was to nullify the author's or statutory heir's ability to use the statutory termination right in order to improve his or her bargaining position. *See id.* (noting the result that "the termination provision would be rendered a nullity"); *see also id.* (citing with approval 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 11.02[A][2] (2000 ed.))

### 3. Because the 1983 Agreement is an Agreement to the Contrary, Gail and Thom Had Rights to and Control Over Certain Works

Under the above analysis, the 1983 Agreement is an "agreement to the contrary." The plain text is clear, and it voids any agreement that tries to encumber a statutory heir's contingent termination rights. The 1983 Agreement purported to restrain Thom's contingent termination rights. Therefore, the agreement is an "agreement to the contrary."

Even when turning to the legislative purpose and applicable precedent, the 1983 Agreement is still an "agreement to the contrary."

Courts have considered several factors appear relevant when deciding whether a particular agreement is an agreement to the contrary within § 304(c) and (d). Courts consider whether the author or heir could exercise termination rights yet. Courts consider whether the agreement achieved the objective of the statutory provisions, *i.e.*, did the author or heir increase remuneration for the work?

The following scenario illustrates why an agreement such as the 1983 Agreement violates the statute. Say A, B, & C are the statutory heirs. In 1985, B and C agree that A will control their future contingent termination rights. The agreement also purports to allow A to assign control of those future rights to someone else, such as through a power of attorney or a will. In 1986, A dies, leaving Z in charge to act on A's behalf. At this point, under the statute, only B and C have any property interest in contingent termination rights. In 2000, a termination window opens for the works, through which the rights can be recaptured from a pre-1978 grant and relicensed for a financially better deal.

If this hypothetical agreement is deemed to NOT be an "agreement to the contrary" and thus valid under the statute, the result conflicts with statutory purpose. When the contingent termination rights come into

existence in 2000, the statutory heirs—the only ones with a property interest in the rights—are blocked from recapturing and relicensing the works, in conflict with congressional intent.  Congress sought to avoid such an outcome by making termination rights inalienable. As a policy choice, only the statutorily-designated individuals are, during the termination window, best situated to decide whether the grants should be revoked and what licensing deal might be better.

Moreover, when the contingent termination rights are formed in 2000, A is no longer alive.  The newly created property rights belong only to B and C, the only living statutory heirs.  The hypothetical agreement, in contrast, allows Z, a stranger to the statutory scheme, to control rights Congress deemed should be controlled by the author's offspring.

That the 1983 Agreement is an "agreement to the contrary" is not inconsistent with the earlier litigations.  Except for Judge Owen's decision, no prior Steinbeck decision decided this precise issue.  *See supra.* And the prior decisions' reasoning does not undermine the correct conclusion here.  For instance, the Second Circuit's 2008 decision mainly concerned the 1994 Agreement and whether an author or an author's statutory could manufacture more than one opportunity to use the

termination right to renegotiate a publishing deal: "[N]othing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

The Second Circuit's nonprecedential 2010 decision likewise did not rule on the validity of the 1983 Agreement, vis-à-vis 17 U.S.C. § 304(c) and (d) termination rights. 400 Fed. App'x 572. Rather, it decided three specific issues: (a) whether the 1983 Agreement "create[d] an agency relationship between Elaine Steinbeck and the Steinbeck sons, or otherwise impose fiduciary obligations on her," *id.* at 575; (b) whether M&O "owed and breached fiduciary obligations created by the 1983 Agreement," *id.* at 576; and (c) whether the 1983 Agreement is a services contract and thus voided by Elaine's death, *id.* at 578–79. While the Estate prevailed, the Second Circuit did not decide whether the 1983 Agreement is an agreement to the contrary.

Because the 1983 Agreement is an agreement to the contrary, Thom's apparent conveyance of any existing or future contingent statutory termination rights was statutorily void. Equally void was any conveyance of authority over such rights. Additionally, because the 1983

Agreement is an agreement to the contrary, Thom never conveyed to Elaine any power over his § 304(d) termination rights because § 304(d) had not been enacted at the time of the agreement, and the agreement did not intend to give away rights–vested or contingent–that did not yet exist under the then-current copyright law.

### 4. Gail and Thom Had Valid Defenses to the Estate's Claims

Under the above analysis, Gail and Thom owned and controlled certain rights. The court should have denied the Estate's summary judgment on the breach and slander claims. Gail argued that she was justified to take the actions she took. This defense would likely have prevailed if the 1983 Agreement controls.

First, there likely would have been no breach. Gail and Thom would have been within their rights to license those at least some Steinbeck Works, and their actions would not have been prohibited by the 1983 Agreement, as it would be unenforceable under the statute.

Second, Gail and Tom would unlikely have been liable for slander. The elements of slander of title are (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss. *Sumner Hill Homeowners' Ass'n, Inc. v. Rio Mesa Holdings, LLC* 141 Cal. Rptr. 3d

109, 135 (Cal. Ct. App. 2012). Gail and Tom did not commit slander of title for any Work for which they validly held rights and control. Indeed, accepting the above argument, Gail and Tom were making true statements and doing little more than exercising her right to license.

Third, the same is true for the intentional interference claim, as explained below. If Gail and Thom owned some or all of the rights, then they were not intentionally interfering with any economic relationship because they were working to ensure that the movies were made and that DreamWorks had the full rights to *The Grapes of Wrath* and Universal had the *East of Eden* rights, just as she testified. *See, e.g.*, ER1142 (Gail: "We wanted the film to go forward.").

\* \* \*

In sum, the 1983 Agreement is an "agreement to the contrary." For this reason, the district court erred in granting summary judgment in favor of the Estate on the breach and slander of title claims.

### B. The District Court Erroneously Excluded Evidence About Gail's Understanding of the 2004 Litigation and Copyright Control Under the 1983 Agreement

The district court's exclusion of evidence and argument about Gail and Thom's understanding of the 2004 Litigation also prejudiced their

ability to defend against the intentional interference claim. The court's rulings restricted the testimony of witnesses and denied Gail and Thom to present evidence and argument directly relevant to the elements of the intentional interference claim.

### 1. Intentional Interference Claim

To prove intentional interference with prospective economic advantage, the Estate had to establish: (1) an economic relationship between the Estate and one or more third parties, with the probability of future economic benefit to the Estate; (2) Gail's knowledge of this relationship; (3) intentional actions by Gail designed to disrupt the relationship; (4) actual disruption; and (5) economic harm to the Estate. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003); *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740 (1995).

The plaintiff must prove that "the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Korea Supply*, 63 P.3d at 950. The intentional interference claim does not require a plaintiff to prove "the defendant acted with the specific

intent, or purpose, of disrupting the plaintiff's prospective economic advantage." *Id.* at 949–50.

Gail and Thom's reasonable understanding was that they had ownership and control over the *The Grapes of Wrath* film rights. This was relevant to their knowledge of the purported economic relationship between the Estate and DreamWorks, including their thinking that the relationship was deficient because DreamWorks did not have all the necessary rights to produce a film. *Cf.* ER0653 (Estate's expert testifying about the importance of having clean title for licensing).

Their reasonable beliefs about the ownership and control of the other works was also relevant. For instance, Gail believed that they were within the termination window for *East of Eden* film rights. Trial testimony suggests she was mistaken. ER0360–0363. Even so, the excluded evidence would have been the necessary context to understand Gail's intent.

Gail and Thom's understanding was also relevant to whether the Estate had proven that they were "substantially certain" the interference with the economic relationship would occur. If they reasonably believed that the 1983 Agreement was not binding, then evidence of their

understanding could have rebutted the Estate's evidence that they "knew that the interference was . . . substantially certain to occur." *Korea Supply*, 63 P.2d at 950.

Gail and Thom also intended to assert a defense based on privilege or justification. To establish such a defense, they had to show that: (1) she had a legitimate financial interest in the economic relations; (2) she acted only to protect their own financial interests; (3) she acted reasonably and in good faith to protect those interests; and (4) she used appropriate means to protect their interests.

"The unjustifiability or wrongfulness of the act may consist of the purpose or motive of the actor as well as the method used." *Sade Shoe Co. v. Oschin & Snyder*, 209 Cal. Rptr. 124, 126 (Cal. Ct. App. 1984). "[E]ven if the means used by the defendant are entirely lawful, intentional interference with prospective economic advantage constitutes actionable wrong if it results in damages to the plaintiff, and the defendant's conduct is not excused by a legally recognized privilege or justification [citations]." *Lowell v. Mother's Cake & Cookie Co.*, 144 Cal. Rptr. 664, 669 (Cal. Ct. App. 1978).

In view of the legal standards for proving intentional interference and the justification defense evidence about the reasonableness of Gail and Thom's belief about their ownership of the Steinbeck Works was relevant to whether they could establish privilege or justification as a defense. The district court erroneously excluded the relevant evidence.

## 2. Excluded Evidence Relating to Intentional Interference

Specific examples of the court's trial rulings underscore the prejudicial nature of the error. The excluded evidence would have shown Gail and Thom's true state of mind and their understanding about the effects her actions might have on the Steinbeck Works. Gail could have established that she acted reasonably and in good faith to protect both her financial interests in the Works and the legacy of the Works.

One example occurred early in the trial, when the Estate's counsel elicited testimony about whether Gail believed she owned the rights in certain Steinbeck Works:

> Q: Now, Ms. Steinbeck, in fact, notwithstanding these decisions, you still believe you have a right to be involved in the Steinbeck works; right?
>
> A: I do.

ER0287. This was followed by more questions about Gail's belief of she had rights, but she was not allowed to fully explain.

Q: You represented to the Wright Center [*sic*, Rights Center] that you had the film or stage rights to *The Grapes of Wrath*; right?

A: I do.

Q: And you also represented that you had the right[s to] film or stage rights to -- *Of Mice and Men*?

A: I do.

Q And you also represented -- you did represent that to her; right?

A: Yes. And I do have them.

MS. KOHLMANN: I move to strike as nonresponsive.

THE COURT: That latter part will be stricken.

ER0407–0408; *see also* ER0285 (Gail's testimony: "Q: Well, you've never treated the 2004 litigations as permanent, have you? A: There were a number of issues left undecided.").

Gail was also blocked from testifying about her experience with and understanding of the termination notices. In one colloquy, Gail was asked to respond to questions she faced earlier about prior termination notices. Judge Hatter blocked that testimony, however.

Q Yesterday, you testified about termination notices that Tom and Blake exercised in 2003 and 2004?

THE COURT: Just a minute.

MS. KOHLMANN: Objection, Your Honor.

- 49 -

THE COURT: Keep your voice up.

MS. KOHLMANN: This is a relitigation -- a re-litigation issue this is one of the issues that Your Honor has already ruled on. It's a relitigation issue.

MR. GRAHAM: If I may...

THE COURT: You may.

MR. GRAHAM: This is what the witness was asked and answered to yesterday. We are simply asking her about those statements.

THE COURT: Go ahead.

MS. KOHLMANN: Well, Your Honor, that was simply -- we asked her nothing about the 2003, 2004 terminations.

THE COURT: All right. We're not going to go into it now and -- sustained.

ER0425–0426.

Similarly, Gail was denied a chance to explain why she believed she had rights to other Steinbeck Works.

Q: Uh-huh. What film licensing deals did you do -- did you and Thom do with M&O's blessing or approval?

A: We licensed *The Winter of our Discontent* twice. We licensed *Travels with Charley* once to Kevin Kostner and another time to --

THE COURT: Just a minute, ma'am.

MS. KOHLMANN: Again, Your Honor, this is getting into relitigation.

THE COURT: All right. It's sustained.

ER1173; *see also* ER0588; ER1174 (sustaining objection because "we're talking about things that are decades old," even though the 1983 Agreement itself is decades old).

The same occurred when Gail's counsel tried asking her questions about her understanding of her ownership of certain rights to *The Pearl*:

Q: Do you know what happened with the -- *The Pearl* project?

A: The first one or the second one?

Q: The first one.

A: The first one --

MS. KOHLMANN: Objection, Your Honor. I believe this is getting into relitigation.

THE COURT: Sustained.

THE WITNESS: Well, it was made. It goes to damages; right?

THE COURT: No, no, ma'am. It's sustained. Go ahead, another question.

BY MR. BERGER:

Q: How did it come to be that there was a screenplay about The Pearl that was under the -- under the control of Disney?

A: The original had been put in turnaround out at Disney. So one of Thom's partners went – hadn't made the – his own screenplay, but Thom's screenplay was still sitting there.

MS. KOHLMANN: Again, Your Honor, we're getting into relitigation issues.

THE COURT: It's sustained.

ER1171.

Gail also tried to explain that she did not believe that the trial court was "was aware of all of the issues" in the earlier litigation. ER1184. Again, this attempted explanation was struck. *Id.*

Gail was left trying to explain her actions when cross-examined about her understanding about the copyright termination rights.

Q: But you knew that there really was no right to terminate at that time, didn't you?

A: There was an absolute right to terminate according to the United States Copyright Office.

Q: But you were intentionally targeting, weren't you, one of the most important parts of the rights to make a film when you contacted Universal, weren't you?

A: I don't think I understand what you're asking me.

Q: You intentionally raised the cloud of title in order for them to listen to you and sit down with you at the table; isn't that right?

A: I still don't know what you're getting at. I've already answered you that I wanted them to make the movie, and we -- we had prepared a number of termination notices that were going out. That happened to be one of them, and I wanted to be sure that they were aware of it so they could talk to Thom and make the movie.

Q: Because you didn't want them to make that movie without you being paid for the rights --

A: No --

ER1192–1193. Of course, on cross-examination, Gail could not fully explain her conduct or her understanding of the termination rights.

The trial court also refused to allow witness testimony about termination rights and their associated complexity. The court excluded the proffered testimony of Mr. Louis Petrich. *See* ER0753. Mr. Petrich would have testified about Gail's understanding of her termination rights. *See* ER0759. The trial court concluded that "testimony by someone who is as learned as Mr. Petrich is, is irrelevant to these issues that are present in this matter at this stage of the litigation." ER0753. Gail wanted to offer other witnesses, who also would have spoken to specifics of the termination rights. The court excluded those witnesses from testifying. *See* ER0005–0010; ER0024–0027.[14]

The trial court also stopped Gail from testifying fully about information she may have received from Jonathan Sanger about potential termination rights. *See* ER0588. The court rejected the

---

[14] Judge Hatter also expressed palpable frustration with Gail's counsel throughout the appeal. *See* ER1094 ("MR. BERGER: Well, currently, we – he's on our list and we would appreciate the opportunity to have him testify, Your Honor. THE COURT: God."); ER1094-1095 ("MR. BERGER: Nor do we. THE COURT: Nor do you? Oh, my God.").

testimony, stating "[i]f it has anything to do with prior litigation, it is not coming in." *Id.*

The trial court's view of the relitigation issue also prejudicially limited the evidence about the earlier 2003 *East of Eden* deal, which again went to Gail's reasonable understanding about the termination rights and the intentional interference claim.

> Q: Well, there was an option agreement years before that lasted for five years. Do you know why that option lapsed?
>
> MS. STEIN: Objection, Your Honor. The earlier East of Eden deal is the subject of the –
>
> THE COURT: Keep your voice up.
>
> MS. STEIN: I apologize.
>
> Objection, Your Honor. The earlier *East of Eden* deal is the subject of the Court's relitigation motion.
>
> THE COURT: Very well. We won't go there. Sustained.

ER0808.

When Gail's counsel cross-examined the Estate's expert on damages, counsel was blocked from eliciting relevant information based on the "relitigation" issue.

> Q: Let's -- you -- you make reference to it in your paragraphs, but you didn't see it?

A: I did see the agreement, but I'm saying I don't know how they came to that conclusion or how they determined who signed what.

Q: How who came to what conclusion?

A: The parties. Waverly Scott, Kaffaga, Tom, Blake, and John, IV's daughter.

Q: Yeah, all of them -- the three different parties working together to reclaim the rights; correct?

MS. STEIN: Objection, Your Honor. This goes squarely to the relitigation issue.

THE COURT: Sustained.

ER0835.

The evidentiary rulings' cumulative effect prejudiced Gail from offering a full trial defense to the liability issue for intentional interference claim. The excluded testimony and evidence would have shown that she did not know an exclusive economic relationship existed between the Estate and Universal or DreamWorks. The evidence would also have shown that she could not have been "substantially certain" that any interference would have resulted. Cf. Obrey, 400 F.3d at 701 (holding reversible error because the Court "cannot conclude, based upon the facts of this case, that the erroneous exclusion of evidence directly probative of the defendant's discriminatory bias and pretext did not taint the jury's verdict.").

For *The Grapes of Wrath* deal, the additional testimony would have confirmed Gail's contention that the executive producer deal was done to ensure DreamWorks had Thom's knowledge about his father as well as all ownership and control over the necessary copyrights. *See, e.g.*, ER0442– 0443.

## V.     The Award of Punitive Damages Should Be Vacated

The jury's award of punitive damages is legally unsupported for at least three reasons.  First, the district court erroneously excluded relevant evidence and argument relevant to punitive damages, namely, Gail's reasonable belief about the ownership and control of the Steinbeck Works.  Second, the Estate did not meet its burden to introduce evidence of Gail's financial condition.  Third, the punitive damages award is unnecessary and disproportionate given the award of $5 million compensatory damages, which by itself achieves the deterrence and retribution objectives of punitive damages.  In short, the Estate did not prove punitive damages by clear and convincing evidence.

### A.     Legal Standard for Punitive Damages

Punitive damages "are aimed at deterrence and retribution." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The Due

Process Clause therefore prohibits a State from imposing a "grossly excessive punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (quotation marks omitted). When "an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm.*, 538 U.S. at 417.

Unlike compensatory damages, no presumption of correctness attaches to a jury's verdict of punitive damages. *Cooper Indus. Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

California law authorizes punitive damages in noncontract cases "where the defendant has been guilty of oppression, fraud, or malice, express or implied," Cal. Civil Code § 3294(a), which must be proven with clear and convincing evidence. *Id.* "[T]he principal purpose of section 3294 is to deter acts deemed socially unacceptable and, consequently, to discourage the perpetuation of objectionable corporate policies." *Egan v. Mutual of Omaha Ins. Co.*, 598 P.2d 452, 457 (Cal. 1979).

California law is clear that punitive damages "are not a favorite of the law and the granting of them should be done with the greatest caution." *Gombos v. Ashe*, 322 P.2d 933, 939 (Cal. 1958). "They are only

allowed in the clearest of cases," and "[m]ere negligence, even gross negligence, is not sufficient to justify such an award." *Id.*

### B. The Excluded Evidence of Gail and Thom's Genuine Belief About Termination Rights was Relevant to Punitive Damages

To assess whether a defendant has acted "with malice, oppression, or fraud," the factfinder must understand the defendant's intent. *See id.* ("[T]here must be an intent to vex, annoy, or injure. Mere spite or ill will is insufficient."). A mistaken belief is not an intentional misrepresentation. Intentional misrepresentation requires, among other things, a knowledge of the falsity of the statement. *Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indemnity Co.*, 225 F. Supp. 3d 1034, 1039 (N.D. Cal. 2016).

Here, the improperly excluded evidence would have proven that Gail and Thom genuinely believed that at least some contingent termination rights were exercisable. *See supra.* The examples of excluded testimony would have shown Gail and Thom lacked any fraudulent or malicious intent because they reasonably believed they had termination rights and control over at least some Works. *See supra.*

- 58 -

## C.    The Admitted Evidence Did Not Establish the Necessary Intent With Clear and Convincing Evidence

Even based on the admitted evidence and testimony, the Estate failed to establish with clear and convincing evidence that Gail and Thom acted with "with malice, oppression, or fraud."  While some evidence about Gail's actions revealed her anger or frustration, no reasonable jury could see that frustration as being malicious or fraudulent—and certainly not by clear and convincing evidence.

First, Gail explained that she did not act with ill will.  *See, e.g.*, ER1144.  While possibly mistaken, and at times apparently angry, she did not intend to harm the Estate or the Steinbeck Works.  Her goal was to vindicate her legal rights (or her belief in those rights) and maximize the value of the Works.  ER1157; ER1164; ER1219.  Gail would have no reason to sabotage any deal because she stood to benefit from them.  She was simply trying to ensure the best outcome for Steinbeck's legacy.  *See, e.g.,* ER0442–0443.

The Estate argued to the district court that Gail and Thom's "conduct was reprehensible" and that their "actions evinced a total lack of respect for the 1983 Agreement and multiple court decisions."  ER1725 (Dkt. No. 312).  But that argument is betrayed by the complexity of the

law, the previous court decisions, and Gail's own statements. Even Anna Culp, the executive at Imagine who worked on the *East of Eden* deal, did not recall being concerned about Gail's statements. ER0576. The Estate's own argument in the Parallel Litigation acknowledged that the Second Circuit did not decide that the 1983 Agreement was valid under 17 U.S.C. § 304. *See supra*. With all this uncertainty and the numerous copyrights involved, Gail has not "repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful." *Johnson v. Ford Motor Co.*, 113 P.3d 82, 90 (Cal. 2005) (quoting *BMW*, 517 U.S at 576–77).

### D. The Punitive Damages Award Is Improper As A Matter Of Law Because It Is Disproportionate To The Evidence Of Defendants' Financial Condition

An award of punitive damages is excessive if it is disproportionate to the defendant's ability to pay. *Adams v. Murakami*, 813 P.2d 1348, 1351 (Cal. 1991). An award can be so disproportionate to an ability to pay that it "is excessive *for that reason alone.*" *Id.* (emphasis in original). An award which exceeds more than two and one-half months of a defendant's annual net income is excessive. *Egan*, 598 P.2d at 457. "[T]he purpose of punitive damages is not served by financially

destroying a defendant." *Adams*, 813 P.2d at 1352; *accord Rufo v. Simpson*, 103 Cal. Rptr. 2d 492, 525 (Cal. Ct. App. 2001).

To sustain a punitive damages award on appeal, the record must contain "meaningful evidence of the defendant's financial condition." *Adams*, 813 P.2d at 1350. The burden to introduce that evidence falls on the entity seeking punitive damages. *Id.* at 1357. This Court's function is to ask if the award is excessive as a matter of law or raises a presumption of being the product of passion or prejudice. *Neal v. Farmers Ins. Exchange*, 582 P.2d 980, 989 (Cal. 1978). An absence of that evidence precludes meaningful review. *Id.*

Here, the Estate failed to meet its burden to introduce evidence about Gail's financial condition. The Estate introduced little to no specific evidence about Gail's finances or possible sources of income. *See* ER1151–1155. For that reason alone, the punitive damages award must be vacated. The Court cannot sufficiently test the damages award in the absence of relevant facts. *See Adams*, 813 P.2d at 1355.

Beyond that, the evidence confirmed Gail's limited financial means. Her monetary interests in the Steinbeck Works gross between $120,000

to $200,000 annually. ER0271.[15] When asked if the royalty payments were enough to live on, she responded, "probably not" because she has "kids going to college." ER0282. Gail has dependents for whom she provides some financial support. ER1448–1449.[16]

Despite this, the jury assessed almost $8 million in punitive damages, with almost $6 million against Gail personally. This punitive damage award also grossly exceeds two and one-half months of Gail's annual anticipated gross royalty income, which is her primary means of support. Applying any standard under California law, an award of almost $8 million dollars is grossly excessive, particularly in view of Gail's current financial condition and the amount of compensatory damages.

---

[15] This amount assumes the *status quo*. The Estate moved for an assignment order assigning for the total royalty stream. *See* ER1727 (Dkt. No. 324). The district court denied that motion, with leave to renew upon completion of the appeal. *See* ER1728 (Dkt. No. 337).

[16] Since the trial, Gail has been without a permanent residence because her rental home, including her personal and business belongings, were severely damaged or destroyed in the Montecito mudslide. *See* ER1727 (Dkt. No. 330, at 5). She has not had a permanent place to stay, largely due to the adverse judgment in this case. *Id.*

Needless to say, to satisfy the judgment of $13 million would require decades of royalty payments. To pay the $7.9 million punitive award would take Gail at least 65 years, assuming an annual *gross* income of $120,000 from the Steinbeck royalties and assuming every penny of that went to satisfy the punitive damages debt.

In short, not only is the evidence insufficient to support the punitive damages award, *Adams*, 813 P.2d at 1355, the award is "grossly excessive" and constitutes an "arbitrary deprivation of property," *State Farm*, 538 U.S. at 408. The court erred in denying judgment as a matter of law and denying a new trial or remittitur.

## VI. There Was No Substantial Evidence Supporting The Damages For The Breach Of The 1983 Agreement

The district court also erred in denying judgment as a matter of law on compensatory damages attributable to the breach claim. No evidence demonstrated any ascertainable damages associated with breaching the 1983 Agreement, independent of the asserted damages for the slander and intentional interference claims. If damages were based on lost profits, any evidence of lost profits was unduly speculative.

## A.  Double Recovery for Breach and Tort Damages Is Not Permitted

*First*, the damages awarded based on the interference and slander claims are redundant to damages awarded for breach of contract, or vice versa.  This is legally impermissible.

Because these complained-of acts are essentially the same acts on which the Estate premised its slander of title and intentional interference claims, the Estate was seeking a double recovery, based on conduct that it believed might constitute both a breach and a tort.  But the law is clear that a party to a contract cannot recover tort damages for breach of contract.  *Khoury v. Maly's of Cal., Inc.*, 17 Cal. Rptr. 2d 708, 712 (Cal. Ct. App. 1993).

In *Khoury*, the complaint alleged breach of contract, breach of good faith and fair dealing and interference with advantageous business relationship.  The plaintiff in *Khoury* alleged an oral contract with the defendant to supply high-end beauty supplies.  *Id.* at 710.  The contract required the plaintiff to attend training and to sell the products.  *Id.*  The plaintiff did so and built a business around selling the beauty products, and his customers would accept no substitutes.  *Id.*  The defendant later refused to sell the products to the plaintiff.  *Id.*  This formed a valid

breach claims, said the court, but the tort claims were not. *Id.* at 712. The court refused to allow separate tort claims based on the same conduct as alleged for the breach claim. *Id.*

Essentially the same occurred here. The jury awarded $1.3 million for breach claim and $1.3 million for the slander of title claim. It was the same amount for breach as for slander—no surprise given the Estate's near-identical damages evidence.

The Estate premised its breach claim on conduct overlapping almost entirely with the allegedly tortious conduct for the slander and intentional interference claims. The Estate's breach claim relies on the same conduct that purportedly interfered with the *The Grapes of Wrath* and *East of Eden* deals. That conduct harmed the Estate only if the statements interfered with some economic advantage or if the statements devalued the Steinbeck Works. Absent those allegedly tortious activities, the Estate has not shown any independent damage with reasonable certainty.

The Estate's summary judgment motion confirms its duplicative damages theory. *See* ER1704 (Dkt. No. 102). The Estate argued that Thom breached the contract "by interfering with the Estate's

negotiations, specifically with *The Grapes of Wrath* and *East of Eden* film deals; (2) "by directly exploiting" certain works, including *The Pearl* and *The Moon is Down*; and (3) "by authorizing the exploitation of certain Works," including *The Pearl* and *Flight*. *Id.*

## B. Evidence of Damages for the Breach was Speculative

The Estate's evidence of purported lost profits because of the breach of the 1983 Agreement (or even based on the tort claims) was impermissibly speculative. The Estate's case therefore lacked substantial evidence necessary to prove lost profits attributable to any wrongful conduct, including breach.

Loss of profits cannot rest on multitude of assumptions underlying the Estate's claim because it does not satisfy the 'reasonable certainty' test." *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993) (holding that lost profits must also be established with "reasonable certainty"). The jury was instructed accordingly: "Damages may only be awarded "when there is some reasonable basis in the evidence . . . for determining that Plaintiff has in fact suffered loss of profits . . . ." ER1259.

The purported breach damages (and other bases for damages) in this case are precisely the type the New York Court of Appeals has found too speculative. In *Kenford Co. v County of Erie,* 493 N.E. 2d 234, 235 (N.Y. 1986), and 537 N.E.2d 176 (N.Y. 1989), the dispute pertained to a contract breach over building a domed sports stadium. 493 N.E.2d at 235. The project went awry, the stadium was not built, and Kenford sought lost profits based on the lack of appreciation of the land surrounding the stadium. Even though everyone expected that "the proposed domed stadium facility would bring about an economic boom in the County and would result in increased land values and increased property taxes," 537 N.E. 2d at 179, the court still held that any award of lost profits was too speculative.

The Court explained that lost profits evidence must be established with "reasonable certainty." 493 N.E.2d at 261. The damages must be directly traceable to the breach, not remote or the result of other intervening causes. *Id.* The plaintiff had used the "industry's most advanced and sophisticated method for predicting the probable results of contemplated projects," but that was not enough. *Id.* at 261–62. The evidence failed to meet the requirement of reasonable certainty because

it rested on a host of speculative assumptions and few known factors: "[W]e note that despite the massive quantity of expert proof submitted . . . , the ultimate conclusions are still projections, and as employed in the present-day commercial world, subject to adjustment and modification." *Id.* at 262.

The Estate's evidence is even more speculative than what *Kenford* rejected. The Estate's expert used general comparisons to supposedly analogous books and films, comparing Steinbeck's *East of Eden* with contemporary best-sellers, such as *The Da Vinci Code* and *The Perfect Storm*. *See* ER0845; ER1613. There was no effort at trial to specifically identify any likely lost profits (or any other damages) caused by the breach. *See* ER0840–0850. Too many dots need connecting between Gail and Tom's statements and the alleged loss of 7.5% of net proceeds of some future film that might never be made. *See, e.g.*, ER0953 (Chris Floyd of DreamWorks testifying that only 3 to 5 out of 100 optioned projects ever get made into a film).

## VII. There Was No Substantial Evidence Supporting The Damages For Slander of Title

The district court erred in denying judgment as a matter of law or granting remittitur or a new trial on compensatory damages attributable

to slander of title. Assuming the Estate had proven slander of title, the Estate's expert offered zero testimony on the amount of damages attributable to slander. Without any such testimony connecting a direct pecuniary loss to the alleged slander, the jury award of $1.3 million must be set aside.

Damages for slander of title cannot rest on speculation. To prove damages, the Estate had to show a direct pecuniary loss. *Sumner Hill*, 141 Cal. Rptr. 3d at 135; *accord Seeley v. Seymour*, 237 Cal. Rptr. 282, 299 (Cal. Ct. App. 1987). Direct pecuniary loss includes the market value loss to the plaintiff's property. *Id.*

The jury instructions for this cause of action explained that damages for slander can be assessed "Plaintiff's goodwill has been damaged, either by damage to the goodwill associated with a particular Steinbeck Work or injury to the general business reputation of all Steinbeck Works." ER1261–1262. And "[t]he measure of Plaintiff's damage is the difference between such goodwill before and after the acts of Defendants." *Id.*

In short, to warrant anything more than nominative damages, the Estate had to provide some non-speculative evidence on which a

reasonable juror could rely that accounted for values before and after the acts of Gail and Thom.  The Estate provided no such evidence.

The Estate's only effort to establish a monetary amount attributable to slander was through its expert testimony.  But the Estate's expert Ms. Arnold provided no specific testimony on slander damages, other than acknowledging Judge Hatter's finding of liability. *See* ER0659; ER0690; ER0713; ER0721.

Ms. Arnold's analysis was legally deficient, however.  She admitted not calculating the Steinbeck Works value, individually or as a whole, *before or after* Defendants' conduct:

> Q: What was the value of the works of John Steinbeck before Tom and Gail's involvement?
>
> MS. STEIN: Objection, Your Honor.
>
> THE COURT:  Sustained.
>
> BY MR. BERGER:
>
> Q: Well, did you calculate the value of the Steinbeck library before Tom and -- and Gail were involved in this century? A: No.
>
> MS. STEIN: Objection, Your Honor.
>
> THE COURT: Well, she's answered. I'll let the answer stand.

ER0832–0833.  The Estate's expert offered a legally deficient analysis because there was no analysis of any alleged loss of value or goodwill.

Rather than do the necessary comparison, Ms. Arnold asserted that the Estate was due $500,000 for damages based on possible option prices for other Steinbeck works.  ER0734–0735.

> Q: And, in your estimation, what is a reasonable calculation of -- a reasonable calculation of harm outside of *Grapes of Wrath* or *East of Eden*, the harm to the whole catalog that we've been discussing?
>
> A: Given the option prices you've seen, you know, in the two documents for the bigger -- for the bigger works that is *East of Eden* and *Grapes of Wrath* being at around hundred to $125,000, we can look at the catalog as a whole out of 30 properties. There would have been other properties that would have been optioned. And if you sum them all up, both small option agreements and larger option agreements over the last 5 to 10 years, it would be somewhere in the range of about $500,000.
>
> Q: And that's just options; is that correct?
>
> A:  Options and -- and some purchase prices, usually, when -- when, you know, they option the material and they're dedicated towards working out.  There's a likelihood that there will be a purchase, but certainly in the option agreements.

*Id.*

Ms. Arnold used speculative hunches about option prices for some Works.  She provided no specifics, such as the identity of any parties who

might have optioned the Works and other information necessary to get beyond speculation. *See* ER0663–0736.

Like the damages for breach of contract, the jury's damages award for slander lacks substantial evidence support. At a minimum, the award is speculative or duplicative of the breach damages. No reasonable jury could have awarded damages of $1.3 million for slander without any evidence on devaluation of the Steinbeck Works.

## VIII. Statement Regarding Oral Argument

Appellants request oral argument. Counsel submits that given the complexity of the issues and the importance of the legal issues presented, oral argument is warranted.

## IX. Conclusion

The grant of summary judgment, the evidentiary rulings, and the denial of post-trial motions are reversible error and should be vacated or reversed.

Date: December 14, 2018          Respectfully submitted,

                                 */s/ Matthew J. Dowd*

                                 Matthew J. Dowd
                                 Dowd Scheffel PLLC
                                 1717 Pennsylvania Avenue, NW
                                 Suite 1025
                                 Washington, D.C. 20006
                                 (202) 559-9175
                                 mdowd@dowdscheffel.com

                                 *Counsel for Appellants*

## STATEMENT OF RELATED CASES

Appellants are aware of one other related case in this Court:

1) *Steinbeck v. Kaffaga*, 702 Fed. App'x 618 (9th Cir. 2017). This case is related in that it involves the same parties and related issues. Further explanation is provided in the foregoing brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word-length limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i). This brief contains 13,998 words as determined by the word-count feature, excluding the portions set forth in Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Century type.

/s/ Matthew J. Dowd
Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9275
mdowd@dowdscheffel.com

Dated: December 14, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this day, December 14, 2018, the foregoing was electronically filed and therefore served electronically via the court's ECF/CM system on all counsel of record.

*/s/ Matthew J. Dowd*
Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com

Dated: December 14, 2018